880 F.2d 481
 30 ERC 1044, 279 U.S.App.D.C. 158, 19
Envtl. L. Rep. 21,127
 STATE OF COLORADO, Petitioner,
v.
UNITED STATES DEPARTMENT OF the INTERIOR, and Manuel Lujan,
Jr., Secretary of the United States Department of the
Interior, Chemical Manufacturers Association and American
Petroleum Institute, Intervenors.
NATIONAL WILDLIFE FEDERATION, Public Citizen, Inc., and
Environmental Defense Fund, Petitioners,
v.
UNITED STATES DEPARTMENT OF the INTERIOR, Chemical
Manufacturers Association and American Petroleum
Institute, Intervenors.
 Nos. 87-1265, 87-1266.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1989.
Decided July 14, 1989.
 
 Eric Glitzenstein and Erik D. Olson, with whom Duane Woodard, Atty. Gen., of the State of Colo., Michael R. Hope, Deputy Atty. Gen., James D. Ellman, Asst. Atty. Gen., Colorado Dept. of Law, and Michael Bean appeared on the brief, for respondents.
 Margaret Kane Harrington, Attorney, with whom Roger J. Marzulla, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, and Randall Luthi, Attorney, Office of the Sol., U.S. Dept. of the Interior, appeared on the brief, for respondents.
 John A. Zackrison, with whom Susan M. O'Sullivan, David F. Zoll, Barbara A. Hindin, G. William Frick, and Catherine M. Eshelman appeared on a joint brief, for intervenors.
 Before WALD, Chief Judge, and ROBINSON and MIKVA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 In these consolidated cases, the state of Colorado and three environmental groups petition this court for judicial review of the so-called "type A" rules promulgated by the Department of the Interior ("DOI") pursuant to section 301(c) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. Sec. 9651(c). The final rules at issue are intended to provide "standard procedures for simplified assessments" of damages to natural resources caused by releases or discharges of oil and hazardous substances. CERCLA Sec. 301(c)(2)(A), 42 U.S.C. Sec. 9651(c)(2)(A).
 
 
 2
 The question presented is whether the scope and content of the rules promulgated comply with section 301(c)(2)(A) of CERCLA. We hold that although DOI's type A rules cover a limited class of cases--namely, minor, short-duration releases in coastal or marine environments--DOI has made, in the face of an ambiguous congressional mandate and technical uncertainties, a reasonable judgment regarding the proper scope of the rules. The content of the type A rules, however, must be revised in light of our decision today in Ohio v. Department of the Interior, 880 F.2d 432 (D.C.Cir. 1989) (upholding in part and invalidating in part DOI's type B rules). Accordingly, we remand to DOI for reissuance of type A regulations consistent with our decision in Ohio. In addition, we expect DOI to continue to promulgate, as expeditiously as possible, further type A regulations to cover as many types of releases in as many different kinds of environments as feasible.
 
 I.
 A. Statutory Background
 
 3
 CERCLA establishes a comprehensive statutory scheme for cleaning up inactive hazardous waste sites. See 42 U.S.C. Secs. 9601-9675. It authorizes, inter alia, federal and state natural resource damage "trustees" to assess and recover from "responsible parties" damages for "injury to, destruction of, or loss of" publicly owned or controlled natural resources, caused by the release of hazardous substances. CERCLA Sec. 107(a)(4)(C), 42 U.S.C. Sec. 9607(a)(4)(C).
 
 
 4
 To carry out this statutory mandate, section 301(c) of CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99-499, 100 Stat. 1630 (1986), provides:
 
 
 5
 (1) The President, acting through Federal officials designated by the National Contingency Plan * * *, shall study and, not later than two years after December 11, 1980, shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this chapter and section 1321(f)(4) and (5) of Title 33 [provisions of the Clean Water Act]. Notwithstanding the failure of the President to promulgate the regulations required under this subsection on the required date, the President shall promulgate such regulations not later than 6 months after October 17, 1986.
 
 
 6
 (2) Such regulations shall specify (A) standard procedures for simplified assessments requiring minimal field observation, including establishing measures of damages based on units of discharge or release or units of affected area, and (B) * * *. Such regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover.
 
 
 7
 (3) Such regulations shall be reviewed and revised as appropriate every two years.
 
 
 8
 42 U.S.C. Sec. 9651(c) (emphasis added). Trustees performing damage assessments under the section 301(c) procedures are granted rebuttable presumptions in any subsequent related proceedings to recover damages. CERCLA Sec. 107(f)(2)(C), 42 U.S.C. Sec. 9607(f)(2)(C).
 
 
 9
 The type A regulations at issue in this case are those promulgated by DOI in response to section 301(c)(2)(A). Section 301(c)(2)(B) requires promulgation of type B rules establishing "alternative protocols for conducting assessments in individual cases." 42 U.S.C. Sec. 9651(c)(2)(B). DOI's type B rules have been challenged in a separate petition for review, which we decide today in Ohio v. Department of the Interior, 880 F.2d 432 (D.C.Cir. July 14, 1989).
 
 B. Regulatory History
 
 10
 On August 14, 1981, the President delegated his duty to promulgate natural resource damage assessment regulations to DOI. See Exec. Order No. 12,316, 46 Fed.Reg. 42,237 (1981), superseded by Exec. Order No. 12,580, 52 Fed.Reg. 2923 (1987).
 
 
 11
 On January 10, 1983, DOI issued an advance notice of proposed rulemaking seeking public comment concerning the development of the damage assessment procedures. See 48 Fed.Reg. 1084 (1983). On August 1, 1983, in response to comments, DOI issued a second advance notice of proposed rulemaking. See 48 Fed.Reg. 34,768 (1983).
 
 
 12
 In 1983 and 1984, three suits were filed (one involving the environmental groups in this case) against DOI for failure to promulgate the damage assessment regulations. On December 12, 1984, the U.S. District Court for the District of New Jersey ruled that DOI had failed to promulgate the regulations in a timely manner. See New Jersey v. Ruckelshaus, No. 84-1668 (D.N.J.1984), aff'd mem., 782 F.2d 1031 (3d Cir.1986). On February 5, 1985, the court entered a consent order requiring DOI to promulgate final type A regulations by August 7, 1986. This deadline was later extended to February 4, 1987, to provide further public comment on the proposed regulations, and extended again by Congress in SARA to April 17, 1987.
 
 
 13
 On May 5, 1986, DOI proposed type A regulations that provided simplified procedures for assessing natural resource damages in coastal and marine environments. See 51 Fed.Reg. 16,636 (1986). The comment period was extended twice to August 18, 1986. See id. at 22,320, 25,903. The final rules were published on March 20, 1987, see 52 Fed.Reg. 9042 (1987), over four years after the original statutory deadline, and are codified at 43 C.F.R. Part 11 (1988).
 
 C. DOI's Type A Rules
 
 14
 DOI's type A rules provide a "simplified assessment process" to determine natural resource damages for discharges or releases "in coastal and marine environments." 43 C.F.R. Sec. 11.41(a)(1); see also 51 Fed.Reg. 16,63 6 (1986). The rules require the use of a computer model developed by DOI and referred to as the Natural Resource Damage Assessment Model for Coastal and Marine Environments ("NRDAM/CME"). See 43 C.F.R. Sec. 11.41(a)(1).
 
 
 15
 The NRDAM/CME assessment methodology consists of four phases: (1) assessment plan, (2) injury determination, (3) quantification, and (4) damage determination. See 43 C.F.R. Sec. 11.41(a)(2). These phases parallel those incorporated in the type B regulations. See 51 Fed.Reg. 27,674 (1986). The NRDAM/CME computer model uses three integrated submodels to make the injury determination, quantification, and damage determination calculations: a "physical fates" submodel, a "biological effects" submodel, and an "economic damages" submodel. During the injury determination phase, the physical fates submodel uses physical parameter values (e.g., the chemical composition of the hazardous substance) to determine the pathway of the contamination. See 43 C.F.R. Sec. 11.41(d)(2). The biological effects submodel, based on factors such as the toxicity of the hazardous substance, then determines the injury to natural resources. Id. Sec. 11.41(d)(4). This submodel is also used during the quantification phase, for example, "to provide an estimate of the total biomass killed." Id. Sec. 11.41(e)(1)(i). Finally, based on these results, the economic damages submodel calculates the damage determination for the coastal and marine environments, such as the economic harm from the closure of fishing areas, hunting areas, and beaches. Id. Sec. 11.41(f).
 
 
 16
 In short, the NRDAM/CME computer model uses databases containing general chemical, biological, and economic information to determine, quantify, and assess economic damages from injuries to natural resources caused by minor, short-duration discharges or releases of oil or hazardous substances in coastal and marine environments. See 52 Fed.Reg. 9045-48 (1987) (overview of NRDAM/CME computer model). See generally Department of the Interior, Measuring Damages to Coastal and Marine Natural Resources: Concepts and Data Relevant for CERCLA Type A Damage Assessments (Jan. 1987) (NRDAM/CME technical documentation), Joint Appendix ("J.A.") at 80. To use the computer model, an authorized official need supply only the necessary incident-specific data, e.g., the estimated total mass discharged or released, the date of the discharge, and the distance to the boundary of the study area. See 43 C.F.R. Sec. 11.41(c).
 
 II.
 
 17
 Petitioners challenge DOI's type A rules on two grounds. They first contend that, because the rules apply only to a narrow class of discharges or releases of oil or hazardous substances, they are arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law. Petitioners also maintain that DOI's type A rules should be remanded because they suffer from the same flaws that they claim render the type B rules unlawful.
 
 A. Jurisdiction
 
 18
 We pause first to discuss a threshold jurisdictional argument. DOI and industry intervenors assert that, to the extent that petitioners claim that DOI should have promulgated more comprehensive type A regulations, this court lacks jurisdiction because petitioners do not seek review of rules already promulgated. See CERCLA Sec. 113(a), 42 U.S.C. Sec. 9613(a) (providing exclusive jurisdiction in this court for judicial "[r]eview of any regulation promulgated under this chapter"); United Technologies Corp. v. EPA, 821 F.2d 714, 720-21 (D.C.Cir.1987) (finding no jurisdiction to review rules not yet promulgated). Moreover, they argue that to the extent that this suit challenges DOI's failure to perform a mandatory duty, it should have been brought in district court. See CERCLA Sec. 310(a)(2), 42 U.S.C. Sec. 9659(a)(2) (permitting civil action in district court "where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter * * * which is not discretionary with the President or such other officer"); Sierra Club v. Thomas, 828 F.2d 783, 790 (D.C.Cir.1987) (under similar provision of the Clean Air Act, district court has exclusive jurisdiction to enforce nondiscretionary duty to act).
 
 
 19
 We note that the rules at issue in this case are merely the first in a series of regulations intended to comply with section 301(c)(2)(A)'s mandate. See 52 Fed.Reg. 9048 (1987) ("The NRDAM/CME is the first type A procedure being developed by the Department of the Interior. At some future date the NRDAM/CME may be expanded or new systems developed to cover other ecosystems, natural resources, substances, and different types of incidents."); see also 51 Fed.Reg. 16,636 (1986). In fact, DOI has already begun the process of promulgating type A regulations for natural resource damages in other environments. See 53 Fed.Reg. 20,143 (1988) (advanced notice of proposed rulemaking seeking comments to assist in the development of additional type A procedures); id. at 20,145 (announcing intent to initiate development of type A procedures for the Great Lakes environment).
 
 
 20
 In our view, however, DOI's jurisdictional argument misreads section 301(c)'s statutory mandate and mischaracterizes petitioners' suit. Section 301(c)(1) expressly requires the President to promulgate natural resource damages assessment regulations "not later than" a date certain. That statutory deadline has now passed, and the regulations promulgated to date therefore constitute the President's complete response in compliance with the statutory requirements of that section. Indeed, DOI asserts (as it must) that the promulgated type A regulations fully comply with CERCLA. Thus, unlike in Sierra Club v. Thomas, 828 F.2d at 787-92, or New Jersey v. Ruckelshaus, No. 84-1668 (D.N.J. Dec. 12, 1984), where the petitioners sought to compel agency action where the agency had not yet acted, petitioners in this case simply seek judicial review of final agency action. Accordingly, even if DOI promulgates additional type A rules sometime in the future, petitioners' claim that the existing inal regulations are unlawful remains reviewable by this court. See CERCLA Sec. 113(a), 42 U.S.C. Sec. 9613(a); cf. Indiana & Michigan Electric Co. v. EPA, 733 F.2d 489, 490-91 (7th Cir.1984) (court of appeals has jurisdiction where complaint of agency inaction is imbedded in a challenge to the validity of a final order). We accordingly conclude that petitioners' challenge to DOI's final regulations is properly before this court.
 
 B. Standard of Review
 
 21
 We review DOI's type A rules, promulgated after informal notice and comment rulemaking procedures under the Administrative Procedure Act, see 5 U.S.C. Sec. 553(c), under the familiar "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, see id. Sec. 706(2)(A). Under this standard, we are mindful a reviewing court is "not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 22
 Moreover, it is well-established that when presented with "a pure question of statutory construction," a reviewing court's "first job is to try to determine congressional intent using 'traditional tools of statutory construction,' " NLRB v. United Food & Commercial Workers, Local 23, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)), for if "Congress has directly spoken to the precise question at issue," then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue," id. at 843, 104 S.Ct. at 2782, then the question becomes whether the agency charged with implementing the statute--DOI in this case--has made a "reasonable" interpretation, id. at 845, 104 S.Ct. at 2783, i.e., one that is "rational and consistent with the statute." United Food & Commercial Workers, 108 S.Ct. at 421.
 
 C. Scope of the Rules
 
 23
 Petitioners first contend that DOI's type A rules are facially invalid because they apply only to an impermissibly narrow class of releases or discharges.
 
 
 24
 DOI does not dispute that the rules under review cover natural resource damages caused only by minor, "point source" discharges or releases of short duration, occurring at or near the water surface, in coastal or marine environments. See 43 C.F.R. Sec. 11.41(a)(1); see also 51 Fed.Reg. 16,636 (1986). Indeed, "[a]lmost all of the comments received [by DOI] on the proposed type A rule expressed the view that the rule be expanded beyond coastal and marine environments." 52 Fed.Reg. 9057 (1987). In particular, both the Environmental Protection Agency ("EPA") and the Commerce Department's National Oceanic and Atmospheric Administration criticized DOI for limiting the rule as it did and encouraged it to expand the scope of its proposed type A rules. See Comments of U.S. EPA 1 (July 3, 1986), J.A. at 1240; Comments of U.S. Dept. of Commerce 3 (Aug. 11, 1986), J.A. at 1288. As petitioner National Wildlife Federation argued before DOI, "by Interior's own estimates about two-thirds or even four-fifths of the liquid spills, and 80 to 85 percent of solid releases, occur in * * * non-marine, non-estuarine areas." Comments of National Wildlife Federation 4 (Aug. 18, 1986) (citing DOI draft technical document), J.A. at 1443.
 
 
 25
 Despite the limited scope of the type A rules, DOI's actions are a sustainable response to an ambiguous statutory mandate in an area of scientific uncertainty. At the outset, we find the statutory language ambiguous as to the intended scope of the type A rules. Section 301(c)(2) provides only that the regulations "shall specify" type A "and" type B rules that identify the "best available procedures" to determine natural resource damages, 42 U.S.C. Sec. 9651(c)(2). This language neither speaks to the scope of the envisioned type A rules nor implies that the type A rules must be universal in their coverage. Indeed, the use of the operative phrase "standard procedures for simplified assessments" (emphasis added) suggests the contrary--that Congress envisioned type A rules to cover only a subset of all releases or discharges of oil and hazardous substances. Moreover, Congress' instruction that DOI use the "best available procedures" implies that Congress delegated to the executive branch a certain amount of discretion in the fashioning of the rules. Our review of the statutory language and its structure persuades us that Congress did not speak directly and specifically to the proper scope of the type A rules and that DOI was therefore faced with an ambiguous congressional command regarding that issue.
 
 
 26
 Petitioners argue that Congress' broad definition of the terms "damages," "natural resources," and "release," see CERCLA Secs. 101(6), (16), (22), 42 U.S.C. Secs. 9601(6), (16), (22); see also 33 U.S.C. Sec. 1321(a)(2) (Clean Water Act's broad definition of "discharge"), establishes an expansive legislative mandate to issue type A regulations that cover all, or at least most, releases or discharges of oil or hazardous substances. This argument, however, is too slender a reed on which to support a reading contrary to the otherwise ambiguous statutory language. CERCLA does much more than create natural resource damage assessment regulations; a broad definition of terms such as "natural resources" and "release" was necessary to provide for diverse matters such as notification requirements, CERCLA Sec. 103, 42 U.S.C. Sec. 9603, remedial action and abatement authority, CERCLA Secs. 104-106, 42 U.S.C. Secs. 9604-9606, and liability, CERCLA Sec. 107, 42 U.S.C. Sec. 9607. We cannot confidently infer that the broad definitions were inserted either to define the scope of the type A rules or, more specifically, to require type A rules for all spills in all ecosystems. Petitioners also suggest that section 301(c)(2)(A)'s requirement of "field observation" implies that Congress intended type A rules to cover damages to terrestrial environments, but in the context of the statute, it is clear that the term is a generic reference to the use of incident-specific (as opposed to theoretical or laboratory) observations.
 
 
 27
 Because we find the statutory language ambiguous as to the intended scope of the type A rules, we turn to the legislative history of section 301(c) to interpret the statute. The Senate report accompanying the bill that contained the language at issue stated that "a simplified type of regulation is necessary to effectively deal with damage assessment in most 'minor' releases of hazardous materials." S.Rep. No. 848, 96th Cong., 2d Sess. 86 (1980) (emphasis added), reprinted in 1 Congressional Res.Serv., Library of Cong., A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, at 305, 393 (Comm. Print 1983) (prepared for the Senate Comm. on Environment and Public Works, 97th Cong., 2d Sess.); see also S.Rep. No. 848, at 85 (noting that type A rules "would be of value in dealing with minor releases") (emphasis added). The type B rules, on the other hand, "would be employed in large or unusually damaging releases and would be used to guide the site-specific damage assessment." Id. at 86 (emphasis added). Congress realized that not even the type B rules could feasibly cover all possible environments, but instead noted that "[i]t is the intent of the legislation that these protocols be designed to accommodate the majority of potential release sites, including coastal estuaries, open water, freshwater rivers, lakes and wetlands." Id. (emphasis added). Because the House concurred in the Senate bill without amendment, see 126 Cong.Rec. 31,950-82 (1980), the Senate report is powerful evidence of congressional intent. We accordingly read section 301(c) with the interpretive gloss put on it by the legislative history: although Congress did not have a specific intent regarding the proper scope of type A rules, it envisioned generally that type A rules would cover most minor releases and type B rules would cover large or unusually damaging releases.
 
 
 28
 The requirement that DOI's type A rules cover "most minor releases," as contemplated by Congress, surely does not have bright-line contours; neither the statutory text nor the legislative history suggests a clear statutory command that certain cases be covered by type A rules. Accordingly, we think that Congress implicitly delegated to the executive branch the authority to decide which categories of spills were sufficiently "minor" to merit application of the simplified type A rules. Under the second step of our Chevron standard of review, the precise issue is therefore whether DOI's type A rules constitute a reasonable exercise of rulemaking authority within the scope conferred on the President by Congress. We conclude that DOI's decision to narrow the scope of its type A rules reflects a permissible interpretation of the statute.
 
 
 29
 We note at the outset that the record makes it difficult to determine precisely how many "minor spills" occur each year, and how many would be covered by the type A regulations as they now stand. Compare 52 Fed.Reg. 9057 (1987) ("small oil spills in aquatic environments [have] historically * * * accounted for almost two-thirds of all incidents, * * * ") (quoting then-director of DOI's CERCLA 301 Project) with Comments of National Wildlife Federation 4 (Aug. 18, 1986) ("by Interior's own estimates about two-thirds or even four-fifths of the liquid spills, and 80 to 85 percent of solid releases, occur in * * * non-marine, non-estuarine areas") (citing DOI draft technical document), J.A. at 1443. Evidence in the record regarding coastal and marine releases is sketchy--for example, many of the statistics measure aquatic spills, a broader classification that includes spills in lakes and rivers. A meaningful determination of the actual scope of DOI's type A rules is therefore difficult. To illustrate: according to figures published by the U.S. Coast Guard for calendar years 1981 and 1982, see U.S. Coast Guard, Polluting Incidents in and Around U.S. Waters 32-33 (1983), J.A. at 2086-87, spills in lakes and rivers ("Inland," in the parlance of the Coast Guard) accounted for about 40 to 50 percent of all aquatic spills of oil and other substances; adding non-aquatic releases to this figure would likely show that DOI's type A rules cover less than a majority of all releases. On the other hand, the fact that spills in coastal and marine environments accounted for over 50 percent of all aquatic releases, see id. (adding figures for "Atlantic," "Pacific," and "Gulf"), suggests that DOI's rules nevertheless cover a significant portion of spills.
 
 
 30
 The difficulty in determining whether DOI's type A rules cover "most" minor releases need not deter us from upholding the scope of the rules, however, for we conclude that DOI has in any event stated a sufficient rationale for limiting the scope of its type A rules as it did. DOI specifically found that data inadequacies and scientific uncertainty precluded a more ambitious approach to the type A rules:
 
 
 31
 Coastal and marine environments were chosen as the subject of the first type A procedure because much more extensive information was available on the fate and effects of discharges or releases of oil or hazardous substances in these environments than for other ecosystems and natural resources.
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 The Department recognizes that the criterion that the discharge or release be of short duration may, in fact, limit the applicability of the NRDAM/CME. However, this limitation is necessitated by the current state-of-the-art in computer modeling and is required at the current time.
 
 
 35
 52 Fed.Reg. 9048, 9053 (1987) (emphasis added). These reasons appear to be fully supported by the evidence in the administrative record. As DOI explained when it promulgated its final rules, "[d]evelopment of standardized type A procedures * * * is much more time-consuming and costly than were the individual incident-specific type B procedures. The Department determined that lookup tables or penalty lists were not the best available procedures[;] consequently, the Department developed a state-of-the-art computer model * * *." Id. at 9057. Indeed, "[m]any comments commended the Department for avoiding the use of 'look up tables' that might have dubious merit." Id. at 9049; see also 51 Fed.Reg. 16,640 (1986).
 
 
 36
 Petitioners point to DOI's own purported recognition that Congress intended type A rule to be broad in scope, noting that DOI's staff recommended further research regarding other environments before comprehensive type A procedures could be developed:
 
 
 37
 [A]s a result of the responses to the Department's [advanced notices of proposed rulemaking] the Department has learned that little information exists concerning damages from small oil spills and minor releases of hazardous substances. An extensive search for existing data on this subject may be necessary. To the extent that needed data prove to be unavailable, information will have to be generated through scientific studies that model physical damages to various natural resources caused by minor releases of oil or hazardous substances.
 
 
 38
 Department of the Interior, Work Plan for Natural Resource Damage Regulations 34 (Sept.1984), J.A. at 1889. DOI's initial attempt to enact more comprehensive regulations, however, is not fatal to its case. In the face of an ambiguous legislative mandate as to the scope of the rules, and in light of DOI's subsequent determinations of data and resource inadequacies, we find that DOI acted reasonably in limiting the scope of the final rules as it did.
 
 
 39
 The reasonableness of DOI's course is underscored by the fact that Congress intended to defer, at least to some extent, to DOI's technical judgment. The Senate report noted that "[t]here is a need for maximum flexibility in the rulemaking proceeding, so that free scientific discussion will result. * * * [T]he state of the art of damage assessment is a complex matter * * * [and] knowledge in this subject is constantly changing." S.Rep. No. 848, at 86. Congress directed that the type A regulations be based on the "best available procedures," CERCLA Sec. 301(c)(2)(B), 42 U.S.C. Sec. 9651(c)(2)(B), and expected DOI to develop "a standardized system for assessing [natural resource] damage[s] which is efficient as to both time and cost" and which would produce "accurate and defensible assessments of resource damages," S.Rep. No. 848, at 85.
 
 
 40
 In sum, despite its footdragging, DOI appears to have made a technically reasonable and responsible determination that the data to produce a suitable computer model for assessing natural resource damages in noncoastal and nonmarine environments were inadequate or insufficiently reliable. We are obliged to defer to DOI's technical judgment that the use of such data would lead to the problem of "garbage-in garbage-out." See NRDC v. EPA, 824 F.2d 1211, 1216 (D.C.Cir.1987) ("it is not for the judicial branch to undertake comparative evaluations of conflicting scientific evidence"); Public Citizen Health Group v. Tyson, 796 F.2d 1479, 1505 (D.C.Cir.1986) ("as long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence"). Moreover, although Congress envisioned that the type A rules would cover "most" minor spills, we believe that, consistent with our reading of the statute and its legislative history, Congress would have accepted DOI's technical justification for the limited scope of its type A rules.
 
 
 41
 We are thus largely persuaded that DOI acted within its mandate in both limiting its regulatory ambit and committing itself and its resources to pursue the remainder of its task. Although the statute does not specifically contemplate an incremental schema, neither does it preclude such an approach--especially given the technological obstacles to a more comprehensive plan. See CERCLA Sec. 301(c)(3), 42 U.S.C. Sec. 9651(c)(3) (providing biennial review and revision of type A and type B rules); S.Rep. No. 848, at 86 (noting need for biennial review due to scientific and technical advances).
 
 
 42
 Petitioners respond that Congress did not require the use of a state-of-the-art computer model and that it instead envisioned the use of standardized "habitat values, tables of values for individual species, and previously conducted surveys and laboratory studies, related to units of discharge or units of affected area," S.Rep. No. 848, at 86. We have no occasion, however, to second-guess DOI's technical determination that such "lookup tables or penalty lists were not the best available procedures," 52 Fed.Reg. 9057 (1987), particularly in light of Congress' clear mandate to require that the damage assessment regulations reflect the "best available procedures," CERCLA Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2), and to ensure the use of "the most accurate and credible damage assessment methodologies available," S.Rep. No. 848, at 86. Moreover, we decline to use a list of suggested options in the legislative history to trump the plain text of a statute, for to do so would turn a cardinal rule of statutory construction on its head.
 
 
 43
 We also reject petitioners' contention that statements made during the passage of SARA in 1986 demonstrate the inadequacy of DOI's type A rules. Although Congress did not make any changes regarding the scope of the type A rules when it enacted SARA, debates in both Houses touched on the subject. Compare 132 Cong.Rec. S14,931 (daily ed. Oct. 3, 1986) (Sens. Baucus and Stafford stating that DOI's "limitation is clearly not the intent of Congress. The majority of spills covered by CERCLA or section 311 of the Clean Water Act occur in areas not covered by type A rules or model[s]") with id. at H9563, H9565, H9623 (daily ed. Oct. 8, 1986) (Reps. Dingell, Lent, and Eckart noting that certain Senate floor statements did not reflect the intent of the conferees). As we have previously remarked, however:
 
 
 44
 to the degree that judges are perceived as grasping at any fragment of legislative history for insights into congressional intent, to that degree will legislators be encouraged to salt the legislative record with unilateral interpretations of statutory provisions they were unable to persuade their colleagues to accept; * * *.
 
 
 45
 International Bhd. of Elec. Workers, Local 474 v. NLRB, 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring). We think the converse is also true: such legislative posturing serves no useful purpose and indeed thwarts effective judicial review of agency action. We will not alter our interpretation of CERCLA based on floor statements that are unconnected with the passage of relevant legislation.
 
 
 46
 We note finally that we are satisfied that DOI has "sufficiently explain[ed] the assumptions and methodology used in preparing the [NRDAM/CME computer] model," Sierra Club v. Costle, 657 F.2d 298, 333 (D.C.Cir.1981). See 52 Fed.Reg. 9045-48 (1987) (overview of NRDAM/CME computer model); Department of the Interior, Measuring Damages to Coastal and Marine Natural Resources: Concepts and Data Relevant for CERCLA Type A Damage Assessments (Jan. 1987) (NRDAM/CME technical documentation), J.A. at 80. The NRDAM/CME computer model "was developed and reviewed by a number of experts, both within and outside the government, * * *. The data bases are extensive and * * * contain the best available information * * *. The [computer model] was the subject of extensive comments during the public comment period, including thousands of test runs." 52 Fed.Reg. 9048 (1987). Petitioners do not challenge the technical capability, accuracy, or reliability of DOI's computer model in the performance of its intended functions. We accordingly reject petitioners' contention that DOI's type A rules are arbitrary and capricious.
 
 D. Content of the Rules
 
 47
 Petitioners also contend that DOI's type A rules suffer from the same flaws that render its type B rules unlawful. We agree and remand the case to DOI to re-issue its type A rules to comply with the relevant principles announced in our decision in Ohio v. Department of the Interior, 880 F.2d 432 (D.C.Cir. 1989). In particular, we hold that DOI's type A rules may not be based exclusively on lost use values to measure natural resource damages. See Ohio, 880 F.2d at 459; see also CERCLA Sec. 301(c)(2)(B), 42 U.S.C. Sec. 9651(c)(2)(B) ("[s]uch regulations * * * shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover ")emphasis added); cf. Cross, Natural Resource Damage Valuation, 42 Vand.L.Rev. 269, 325-26 (1989) (concluding that "[t]he current approach [in DOI's type A rules] vastly underestimates the value of damaged natural resources") (footnote omitted).
 
 
 48
 DOI concedes that its type A rules fail to incorporate restoration or replacement values, but explains that "[u]se values were used rather than restoration or replacement costs because adequate data were not available to create a standardized model based on average values for restoration costs." 52 Fed.Reg. 9051 (1987); see also id. at 9085 (stating that the NRDAM/CME computer model values marine mammals such as whales, dolphins, and sea otters at zero, because "information on toxicity from oil, and especially hazardous substances, to marine mammals is relatively scarce"). Although data limitations undoubtedly exist, such limitations cannot justify DOI's decision to ignore the clear mandate of Congress as interpreted in Ohio. Moreover, several states, according to petitioners, apparently already use standardized restoration costs for calculating natural resource damages. See Halter & Thomas, Recovery of Damages by States for Fish and Wildlife Losses Caused by Pollution, 10 Ecology L.Q. 5, 19 (1982).
 
 
 49
 We also reject DOI's argument that, because it considered, though ultimately rejected, the use of replacement or restoration values in its type A rules, it complied with the literal terms of section 301(c)(2)(B). Apart from misreading Congress' use of the phrase "shall take into consideration" (emphasis added), DOI's formalist argument fails on its own terms, for section 301(c)(2)(B) expressly provides that the regulations (not DOI) must take into consideration replacement value.
 
 III.
 
 50
 We uphold DOI's type A regulations against petitioners' challenge with respect to their scope, but only in light of our finding of ambiguous congressional command on the issue and our deference to DOI's technical judgment. We remand the rules, however, to permit DOI to develop standard procedures for simplified assessments of natural resource damages consistent with the relevant portions of our decision in Ohio. We fully expect DOI to act as expeditiously as possible.
 
 
 51
 It is so ordered.