992 F.2d 337
 36 ERC 1819, 301 U.S.App.D.C. 175, 61
USLW 2707,
23 Envtl. L. Rep. 20,827
 SIERRA CLUB, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Edison Electric Institute, et al., Waste Management of North
America, Inc., Intervenors.
NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,
v.
William K. REILLY, Administrator, U.S. Environmental
Protection Agency, Respondent,
Edison Electric Institute, et al., Waste Management of North
America, Inc., Intervenors.
 Nos. 92-1003, 92-1005.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 11, 1993.
Decided May 7, 1993.
 
 Petitions for Review of Regulations of the United States Environmental Protection Agency.
 James F. Simon, New York City, and Howard I. Fox, Washington, DC, argued the cause, for petitioners. With them on the joint briefs were Mark Kataoka and Jessica Landman, Washington, DC.
 Gretchen S. Pirasteh and Mark A. Nitczynski, Attys., Dept. of Justice, Washington, DC, argued the cause, for respondent. With them on the brief were Raymond Ludwiszewski, Acting Gen. Counsel, and Andrew G. Gordon, Atty., U.S.E.P.A., Washington, DC.
 William R. Weissman and Douglas H. Green, Washington, DC, entered appearances, for intervenors Edison Elec. Institute, et al.
 Daniel H. Squire and James A. Rogers, Washington, DC, entered appearances, for intervenor Waste Management of North America, Inc.
 Before: MIKVA, Chief Judge, HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the court filed PER CURIAM.
 
 
 1
 Opinion dissenting in part filed by Chief Judge MIKVA.
 
 PER CURIAM:
 
 2
 Households in this country generate some 180 million tons of solid waste every year. The dangers posed by this ever-growing mountain of garbage prompted congressional legislation, including 1984 amendments to the Resource Conservation and Recovery Act (RCRA), Pub.L. No. 98-616, 98 Stat. 3221, directing the Environmental Protection Agency to promulgate rules regulating landfills that receive certain types of hazardous wastes. See 42 U.S.C. § 6949a(c). These consolidated petitions for review challenge the Agency's final rule setting forth minimum federal criteria for municipal solid waste landfills. See 56 Fed.Reg. 50,978 (1991) (to be codified at 40 C.F.R. pts. 257 & 258).
 
 
 3
 * Two regulatory statutes are before us. The first, already mentioned, is RCRA, enacted in 1976 to "establish a comprehensive federal program to regulate the handling of solid wastes." Environmental Defense Fund v. United States Environmental Protection Agency, 852 F.2d 1309, 1310 (D.C.Cir.1988). Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939b, creates a "cradle-to-grave" regulatory structure for the disposal of hazardous wastes. See United Technologies Corp. v. United States Environmental Protection Agency, 821 F.2d 714, 716-17 (D.C.Cir.1987). Subtitle D of RCRA, 42 U.S.C. §§ 6941-6949a, governs the disposal of nonhazardous solid wastes. Unlike Subtitle C, Subtitle D was to be largely state-administered upon the Agency's approval of the state's solid waste management plan. Subtitle D required the Agency to promulgate regulations to assist the states in developing and implementing their plans. See 42 U.S.C. § 6942(b). In separate 1979 rulemakings, the Agency issued basic criteria for Subtitle D sanitary landfills, see 40 C.F.R. pt. 257, and guidelines for the approval of state Subtitle D waste management plans, see 40 C.F.R. pt. 256.
 
 
 4
 When the Agency promulgated its primary Subtitle C regulations in 1980, it created a permanent exemption from regulation for hazardous wastes generated in households, and a temporary exemption for hazardous wastes from facilities generating less than 1,000 kilograms of hazardous waste per month (so-called "small quantity generator wastes"). See 45 Fed.Reg. 33,098-99, 33,102-05 (1980). Concerned about possible contamination of Subtitle D facilities, Congress in its 1984 RCRA amendments directed the Agency to promulgate new rules for Subtitle D "facilities that may receive hazardous household wastes or hazardous wastes from small quantity generators." 42 U.S.C. § 6949a(c). See H.R.CONF.REP. No. 1133, 98th Cong., 2d Sess. 117 (1984), U.S.Code Cong. & Admin.News 1984, 5576. The Amendments specified that the revised criteria:
 
 
 5
 shall be those necessary to protect human health and the environment and may take into account the practicable capability of such facilities. At a minimum such revisions for facilities potentially receiving such wastes should require ground water monitoring as necessary to detect contamination....
 
 
 6
 42 U.S.C. § 6949a(c). Congress fixed a statutory deadline of March 31, 1988, for the Agency to issue the revised regulations. See id. As with the original Subtitle D program, the states were to play a central role in implementing the new criteria. See 42 U.S.C. § 6945(c)(1)(B).
 
 
 7
 The other statute with which we are concerned is the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387. In a 1987 amendment to the Clean Water Act, Congress required the Agency to identify "toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment." 33 U.S.C. § 1345(d)(2).[1] The provision directs the Agency to set "numerical limitations" for safe concentrations of each toxic substance for a variety of uses of sludge, including disposal in landfills. Id. The Agency may, however, substitute "a design, equipment, management practice, or operational standard" adequate to protect human health and the environment in the place of numerical limits if such limits for a pollutant are, "in the judgment of the Administrator," "not feasible to prescribe or enforce." 33 U.S.C. § 1345(d)(3).
 
 
 8
 In the rulemaking under review, the Agency sought to fulfill its obligations under RCRA § 4010(c) (42 U.S.C. § 6949a(c)), and under the portion of CWA § 405(d) (33 U.S.C. § 1345(d)) concerning sludge deposited with other solid wastes in municipal landfills--that is, "co-disposed" sludge. See 56 Fed.Reg. 50,978 (1991). The Agency adopted regulations establishing minimum federal criteria for the location, design and operation of municipal solid waste landfills. Of importance to this case, the Agency concluded that numeric limits for toxins in co-disposed sludge were not feasible to prescribe, and that the design and operation standards for municipal landfills contained in the new regulations would sufficiently protect public health and the environment. See 56 Fed.Reg. 50,997-98 (1991). Also, the Agency exempted certain small landfills from the groundwater monitoring requirements the new rule generally imposes. See id. at 50,989-91 (to be codified at 40 C.F.R. § 258.1(f)). Petitioner Natural Resources Defense Council (NRDC) challenges these two decisions, as well as the Agency's failure to provide for direct public access to certain documents relating to compliance. See id. at 51,056-57. Petitioner Sierra Club challenges the Agency's decision to restrict its rulemaking to municipal facilities to the exclusion of non-municipal ones. See 56 Fed.Reg. 50,978 (1991) (to be codified at 40 C.F.R. § 258.1(a)). (The latter category includes such facilities as industrial landfills and construction debris landfills.)
 
 II
 
 9
 * NRDC devotes a considerable portion of its argument to the Agency's failure to promulgate specific numeric limits for safe levels of toxic substances in sludge co-disposed in municipal solid waste landfills. In the final rule's preamble, the Agency explained why it had concluded that such numeric limits were not feasible. See 56 Fed.Reg. 50,997 (1991). The Agency cited gaps in scientific knowledge about two critical areas. First, it could not measure the effects of chemical interactions between pollutants in sewage sludge and pollutants in solid waste. Second, it had insufficient data about the chemical composition of the debris in typical municipal landfills. Without this information, the Agency said, "it would not be scientifically defensible" to formulate numeric limits for sludge pollutants. Id. The Agency further concluded that its new design and operation standards for municipal landfills would sufficiently protect human health and the environment from sludge pollutants, see id., a conclusion not directly challenged here.
 
 
 10
 NRDC's objection to the Agency's solution relies on a separate proposed regulation promulgated under § 1345(d) to govern all uses of sewage sludge other than co-disposal. There the Agency did set specific numeric limits for toxin concentrations. See 54 Fed.Reg. 5746 (1989) (proposed rule).[2] NRDC thinks the Agency should have applied the same numeric limits to co-disposed sludge.
 
 
 11
 The Agency explicitly considered and refused to accept this proposal. See 56 Fed.Reg. 50,997 (1991). The other-uses numeric limits had been derived from complex mathematical models simulating "the movement of pollutants through the environment." Id. See 54 Fed.Reg. 5764-78 (1989). The same models could not be used for pollutants in sewage sludge disposed of with municipal waste. Sludge mixed with garbage creates a chemical interaction. The Agency had insufficient scientific information about the interaction. It had some preliminary indications that sludge, which typically represents only 5 percent of the volume of materials deposited in landfills, slowed down the leaching of metals and other substances resulting from the decomposition of garbage alone. Sewage sludge might, therefore, "reduce[ ] the mobility of metals in landfills." 56 Fed.Reg. 50,997 (1991). But the Agency lacked sufficient data about the levels of organics and metals in the garbage typically deposited in landfills. Without this data and without a clear scientific understanding of the chemical interaction between sludge and garbage, the Agency could not construct a "scientifically defensible" model to simulate the percentage of the pollutants leaching from the sludge component of the landfill. Id.
 
 
 12
 The Agency's approach embodies an interpretation of 33 U.S.C. § 1345(d)(3). The statute allows the Agency to dispense with numeric limits when, in the Administrator's judgment, these are "not feasible to prescribe or enforce." Numeric limits are not feasible, the Agency has decided here, when the method for arriving at them is not scientifically defensible. NRDC does not quarrel with this interpretation. Yet it offers no scientific studies to support the proposition that the same numeric limits for sludge alone apply to sludge mixed with garbage. The Agency did not even hazard a guess about what happens to pollutants in sludge as a result of the chemical interaction between it and garbage. It simply did not know, and it could not begin to know without testing a model based in part on assumptions regarding the amount of each pollutant contained in the leachate attributable to the sludge. The Agency's observation that sludge may slow down the decomposition of garbage, and thus the leaching of metals contained in garbage, does not entail the conclusion that pollutants in the co-disposed sludge continue to act the same as pollutants in sludge-only landfills.[3] NRDC's alternative proposal thus rests on a hypothesis yet to be tested. In the meantime, Congress has entrusted determinations about the feasibility of numeric limits to "the judgment of the Administrator." 33 U.S.C. § 1345(d)(3). Here, the Agency has made the scientific assessments needed for that judgment and has adequately set forth the reasons underlying its regulation. Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1504-05 (D.C.Cir.1986); Natural Resources Defense Council, Inc. v. Administrator, U.S. EPA, 902 F.2d 962, 972 (D.C.Cir.1990), cert. denied, 498 U.S. 1082, 111 S.Ct. 952, 112 L.Ed.2d 1040 (1991).
 
 B
 
 13
 Our conclusion that the Agency's refusal to promulgate numeric limits does not violate CWA leads us to reject NRDC's related challenge to the Agency's "removal credit" scheme. Industrial facilities that discharge wastewater to publicly owned treatment works for treatment must comply with pretreatment standards promulgated by the Agency under CWA. See 33 U.S.C. § 1317; 40 C.F.R. pt. 403. Industrial sources are likely to be aware of the specific pollutants they discharge, and may be able to treat such pollutants more efficiently or effectively than the treatment works. See 56 Fed.Reg. 50,997 (1991). However, Congress recognized the possibility that industrial source pretreatment could duplicate part or all of the subsequent treatment routinely provided by a publicly owned treatment works. See generally Armco, Inc. v. United States Environmental Protection Agency, 869 F.2d 975, 978 (6th Cir.1989). Therefore, Congress in 33 U.S.C. § 1317(b)(1) gave such works the authority, in certain circumstances, to grant "removal credits" to industrial sources which would otherwise perform duplicative pretreatment. The effect of the credit is to allow such sources to ignore the usual pretreatment rules to the extent the public facility treats a given pollutant. The Agency's removal credit rules are set forth in 40 C.F.R. § 403.7.
 
 
 14
 Among other statutory restrictions, a publicly owned treatment works can only grant removal credits if the scheme does not prevent the works' compliance with sludge disposal regulations promulgated under § 1345. See 33 U.S.C. § 1317(b)(1). In Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 790 F.2d 289, 311-14 (3d Cir.1986), cert. denied, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), the Third Circuit held that the Agency could not authorize the granting of removal credits in the absence of valid sludge disposal regulations under § 1345. See also 33 U.S.C. § 1345 note. In the present rulemaking, the Agency announced that because it fulfilled part of its § 1345 mandate with design and operation standards for municipal landfills, it henceforth would allow public treatment works disposing of sludge in conforming landfills to grant removal credits. See 56 Fed.Reg. 50,997-98 (1991). NRDC claims that the removal credit scheme remains in violation of the statute, but we fail to see how. The removal credit issue, as the parties see it, depends on the § 1345 issue. The situation here would be the same as that before the Third Circuit in Natural Resources Defense Council only if the Agency had not complied with § 1345. Since we have held that the Agency has complied with § 1345, it follows that the Agency properly allowed removal credits.
 
 
 15
 Allowing public treatment works to grant removal credits in the absence of numeric limitations under § 1345, NRDC asserts, will create a perverse incentive for such facilities to deposit their sludge in landfills. The idea is that sludge disposed in properly designed and operated landfills will necessarily satisfy § 1345 for the purposes of the removal credit provision, whereas sludge designated for any other use will have to satisfy the Agency's separately promulgated numeric limits. NRDC points out the Agency's acknowledgement that landfill disposal is among the least beneficial of all possible reuses of sludge. See, e.g., 54 Fed.Reg. 5748 (1989); 49 Fed.Reg. 24,358-59 (1984). The problem NRDC identifies, if it is a problem, is inherent in the legislation. Congress could have required numeric limits for all sludge uses under § 1345, or it could have conditioned the grant of removal credits under § 1317 on the existence of such numeric limits. It did neither. The Agency did not exceed its authority by failing to write such limitations into a statutory scheme containing none.
 
 III
 
 16
 NRDC also objects to the Agency's failure to require, as part of its municipal solid waste disposal facility criteria, landfill operators to allow public access to the primary documents they must maintain as evidence of their compliance with the regulations' substantive requirements. See 56 Fed.Reg. 51,056-57 (1991) (to be codified at 40 C.F.R. § 258.29). Without such public access, NRDC maintains that there cannot be full public participation in the "implementation[ ] and enforcement" of the regulations. See 42 U.S.C. § 6974;[4] Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 859 F.2d 156, 175-76 (D.C.Cir.1988).
 
 
 17
 The Agency long ago--as part of its 1979 rulemaking establishing guidelines for state Subtitle D programs--promulgated public participation regulations; we assume these meet the statutory requirement of "minimum guidelines." See 44 Fed.Reg. 45,066, 45,079 (1979) (codified as amended at 40 C.F.R. § 256.60-.65).[5] These Subtitle D-specific guidelines are supplemented by more general ones dealing with all RCRA and CWA programs. See 40 C.F.R. pt. 25. Given these existing regulations, which apply of their own force to state programs created to implement the new municipal landfill rules, see, e.g., 56 Fed.Reg. 50,995 (1991), NRDC's complaint reduces to a claim that the Agency should have issued further regulations it chose not to issue. Our decisions make clear that the jurisdictional statute petitioner invokes, 42 U.S.C. § 6976(a), ordinarily does not permit us to entertain such claims. See Hazardous Waste Treatment Council v. United States Environmental Protection Agency, 861 F.2d 277, 287 (D.C.Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); United Technologies Corp. v. United States Environmental Protection Agency, 821 F.2d 714, 720-21 (D.C.Cir.1987).
 
 
 18
 NRDC argues that a contrary result is compelled here by Colorado v. United States Department of Interior, 880 F.2d 481 (D.C.Cir.1989), and Citizens for a Better Environment v. EPA, 596 F.2d 720 (7th Cir.1979). Colorado held that when regulations are promulgated pursuant to a statutory date certain, a court may after that date entertain challenges to an agency's failure to regulate further. The theory is that the issued regulations may be considered the agency's "complete response in compliance with the statutory requirements." 880 F.2d at 485. The situation here does not fit Colorado 's rationale. While the 1984 Amendments do contain a date certain for issuance of new solid waste landfill guidelines (whose implication we consider in Part V), that deadline by its own terms applies only to those substantive guidelines. See 42 U.S.C. § 6949a(c). There is no indication that the Agency must issue additional public participation guidelines by that date. Nor does the text of the public participation clause of RCRA even hint that regulations thereunder must be revised every time the Agency issues a new substantive RCRA regulation. See id. § 6974.[6] Citizens for a Better Environment fares no better. That case, which arose under the nearly identical public participation provision of the Clean Water Act, held that the Agency could not approve a state compliance plan without establishing and enforcing upon the states federal public participation guidelines. 596 F.2d at 724-25. As we have said, here the Agency has done just that in the regulations codified at 40 C.F.R. § 256.60-.65.
 
 IV
 
 19
 NRDC next challenges the final rule's exemption of small landfills from its general groundwater monitoring requirements. Because we conclude the exemption conflicts with the express and clear mandate of RCRA § 4010(c), we vacate the exemption and remand to the Agency for further consideration. See Fertilizer Inst. v. EPA, 935 F.2d 1303, 1309-10 (D.C.Cir.1991) (vacating portion of final rule that ran contrary to plain meaning of statute).
 
 
 20
 As noted above, § 4010(c) provides that the revised criteria
 
 
 21
 shall be those necessary to protect human health and the environment and may take into account the practicable capability of such facilities. At a minimum such revisions for facilities potentially receiving such wastes should require ground water monitoring as necessary to detect contamination, establish criteria for the acceptable location of new or existing facilities, and provide for corrective action as appropriate.
 
 
 22
 42 U.S.C. § 6949a(c). In its proposed rule, the Agency construed subsection 4010(c) to require groundwater monitoring at all municipal solid waste landfills, regardless of size. See 53 Fed.Reg. 33,313, 33,405-17 (to be codified at 40 C.F.R. pt. 258) (proposed Aug. 30, 1988), 33,366 ("Today's proposed ground-water monitoring and corrective action requirements apply to the owners or operators of all new and existing [municipal solid waste landfills].") (emphasis added), 33,326 ("EPA is not proposing any special exceptions for [municipal solid waste landfills]."). The Agency explained that it "believe[d] that the Congressional intent was to require groundwater monitoring at all [municipal solid waste landfills] that may receive [hazardous household waste] or [small quantity generator] waste" because (1) "[s]ection 4010(c) directs EPA specifically to include ground-water monitoring 'as necessary to detect contamination' among the revisions to the criteria and, while allowing the Agency to consider practicable capability, does not identify any exceptions to this requirement" and (2) "[t]he legislative history also is silent with respect to any exemptions from ground-water monitoring." 53 Fed.Reg. at 33,366. The Agency also expressed its view that "ground-water monitoring at all facilities, including those that are properly designed and operated, ... [is] an essential measure to ensure protection of human health and the environment," relying on its findings that "ground-water monitoring is the most reliable method for determining whether a landfill is in compliance with the overall performance standard of the proposed Criteria revisions" and that "[e]ven the best designs, operating practices, and quality control procedures cannot always prevent unexpected failure of a landfill." Id.; see also id. at 33,324 ("The Agency believes that at least minimal ground-water monitoring is necessary at all [municipal solid waste landfills] to evaluate the performance of facility design and operation and to identify potential threats to human health and the environment. Furthermore, [the 1984 RCRA amendments] specifically mandate[ ] that the revised Criteria require ground-water monitoring as necessary to detect contamination at facilities that may receive [hazardous household waste] or [small quantity generator] waste.").
 
 
 23
 In its final rule, the Agency changed course and created a "small landfill" monitoring exemption:
 
 
 24
 Owners or operators of new [municipal solid waste landfill] units, existing [municipal solid waste landfill] units, and lateral expansions that dispose of less than twenty (20) tons of municipal solid waste daily, based on an annual average are exempt from subparts D and E of this part, so long as there is no evidence of existing ground-water contamination from the [municipal solid waste landfill] unit, and the [municipal solid waste landfill] unit serves:
 
 
 25
 (i) A community that experiences an annual interruption of at least three consecutive months of surface transportation that prevents access to a regional waste management facility, or
 
 
 26
 (ii) A community that has no practicable waste management alternative and the landfill unit is located in an area that annually receives less than or equal to 25 inches of precipitation.
 
 
 27
 56 Fed.Reg. at 51,017 (codified at 40 C.F.R. § 258.1(f)(1)). We believe the Agency had it right the first time and that the statute requires groundwater monitoring at all municipal landfills, regardless of size or location, "as necessary to detect contamination."
 
 
 28
 In establishing the small landfill exemption, the Agency intended to "grant[ ] relief ... to certain small [municipal solid waste landfills] where compliance with the revised Criteria is beyond the practicable capability of their communities and circumstances make regional waste management impracticable." 56 Fed.Reg. at 50,990. To harmonize the exemption with the language of § 4010(c), the Agency explained: "[B]oth the surface transportation difficulties and the 'no practicable waste management alternatives' criteria for obtaining an exemption reflect the 'practicable capabilities' evaluation that the statutory language of section 4010(c) and the legislative history indicate Congress intended EPA to conduct when revising the criteria under section 4004(a)." 56 Fed.Reg. at 50,991. We reject this justification as contrary to the plain meaning of the statutory language.
 
 
 29
 Admittedly, § 4010(c) permits the Agency generally to "take into account the practicable capability" of disposal facilities in determining which revised criteria are "those necessary to protect human health and the environment." This general discretion, however, does not extend to the determination whether to require groundwater monitoring. Instead, the statute specifically stipulates that "at a minimum" the revised criteria require groundwater monitoring "as necessary to detect contamination." Thus, as the plain language of the statute makes clear, the only factor relevant to determining whether a particular facility should be required to maintain groundwater monitoring is whether such monitoring is necessary to detect contamination, not whether it is "practicable." We therefore conclude that the small landfill exemption, insofar as it reflects a desire to accommodate a facility's "practicable capability," is inconsistent with the clear intent of the statute.
 
 
 30
 While both the final rule's preamble and the Agency's brief on appeal focus on the impracticability of monitoring for small landfills,[7] the preamble also offered additional, subsidiary justifications for the exemption:
 
 
 31
 First, to address Congressional concern for ground-water contamination, EPA has narrowly drawn the exemption such that only those small [municipal solid waste landfills] for which there is no evidence of ground-water contamination are eligible for the exemption (in addition to one of the other two criteria). Second, as stated above, the exemption is a conditional one such that the owner/operator is no longer eligible for the exemption when there is evidence of ground-water contamination associated with the facility. As such, the facility cannot escape corrective action for known releases. Third, the 25-inch cap on annual precipitation contained in the second criterion ensures that this exemption will be limited to those small [municipal solid waste landfills] where the risk of ground-water contamination is considerably reduced.
 
 
 32
 56 Fed.Reg. at 50,991. These rationales are no more compelling. The record provides no basis to conclude that either lack of evidence of contamination or the aridity of a facility's climate suffices to establish that groundwater monitoring is not "necessary to detect contamination," which is the sole statutory ground for dispensing with the monitoring requirement. Nor has the Agency cited any evidence to refute its earlier, emphatic conclusions that groundwater monitoring is "an essential measure to ensure protection of human health and the environment," 53 Fed.Reg. at 33,366, "the most reliable method for determining whether a landfill is in compliance with the overall performance standard of the proposed Criteria revisions," id., "necessary at all [landfills] to evaluate the performance of facility design and operation and to identify potential threats to human health and the environment," id. at 33,324, and, ultimately, is among the "minimum statutory requirements," id. at 33,326, and one which "[the 1984 amendments] specifically mandate[ ] that the revised Criteria require ... as necessary to detect contamination.," id. at 33,324.
 
 
 33
 For the foregoing reasons, we conclude the Agency must revise its final rule to require groundwater monitoring, as necessary to detect contamination, at all landfills. While such factors as size, location and climate may affect the extent or kind of monitoring necessary to detect contamination at a specific facility, they cannot justify exemption from the statutory monitoring requirement. Accordingly, we vacate the rule's small landfill exemption and remand to the Agency for further action consistent with the statutory requirement.
 
 V
 
 34
 Section 4010(c) of RCRA requires the Agency, by March 31, 1988, to promulgate revisions to the criteria established for Subtitle D facilities "that may receive hazardous household wastes or hazardous wastes from small quantity generators." 42 U.S.C. § 6949a(c). This category of facilities includes not only municipal solid waste landfills ("MSWLFs"), but also industrial landfills, surface impoundments, land application units, waste piles, and construction/demolition waste landfills. See 56 Fed.Reg. 50,999 (1991). Nonetheless, the final rule under review revised the criteria only for MSWLFs. The Sierra Club claims that the rule falls short of the statutory requirement.
 
 
 35
 The Agency does not contend that RCRA § 4010(c) applies only to MSWLFs. On the contrary, in the preamble to the proposed rule, the Agency acknowledged that the "mandated scope includes all MSWLFs, which may receive [hazardous household waste] and [small quantity generator] hazardous waste, and some industrial solid waste disposal facilities and certain other Subtitle D facilities, which may receive [small quantity generator] hazardous waste." 53 Fed.Reg. 33,322 (1988). The Agency stated, however, that it had "obtained extensive information on only the characteristics of MSWLFs," and that "[n]either EPA nor the States have comparable information on industrial solid waste disposal facilities at this time." Id. It therefore decided to undertake the revisions to the RCRA criteria in "phases," addressing MSWLFs in the present rule and other Subtitle D facilities "at such time as EPA has adequate data on which to base its decision." Id.
 
 
 36
 It is now five years after the statutory deadline of March 31, 1988 imposed by RCRA § 4010(c), and the Agency still has not issued revised criteria for non-municipal facilities. The Agency claims that the "ambiguous" language of § 4010(c) permits it to defer these revisions indefinitely until it gathers sufficient information regarding these facilities. The Agency's efforts to establish that the statute is somehow ambiguous are unavailing, however. Section 4010(c) clearly states, "Not later than March 31, 1988, the Administrator shall promulgate revisions of the criteria ... for facilities that may receive hazardous household wastes or hazardous wastes from small quantity generators." 42 U.S.C. § 6949a(c). By its plain language, this provision obligates the Agency to issue, by the deadline, revisions for all facilities that may receive such wastes. It does not contemplate partial compliance. The Agency was of course free, as it claims, to revise the criteria in phases, but it was required to complete all of the phases before the deadline.
 
 
 37
 There is no question that there are non-municipal industrial facilities that receive waste from small quantity generators. The Agency itself has recognized this fact. 53 Fed.Reg. 33,322 (1988). See also EPA Office of Solid Waste, "Options Paper on Broad Issues: Revisions to the RCRA Subtitle D Criteria for Classification of Solid Waste Disposal Facilities and Practices" (September 5, 1986), at 8 ("The major drawback to limiting the rule to municipal waste landfills is that it falls short of the statutory requirement."). By failing to promulgate the requisite revisions as to all relevant facilities by March 31, 1988, the Agency has breached a non-discretionary duty.
 
 
 38
 The Agency contends that the district court, rather than this Court, has jurisdiction to consider the Sierra Club's challenge to the scope of the revisions. In support of this argument, the Agency cites § 7002 of RCRA, which provides that "any person may commence a civil action on his own behalf ... against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," and that any such action "may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia." 42 U.S.C. § 6972(a)(2).
 
 
 39
 Indeed, this Court has established that the district court possesses jurisdiction over claims alleging that an agency has violated a nondiscretionary duty of timeliness imposed by a statutory deadline. Sierra Club v. Thomas, 828 F.2d 783, 790 (D.C.Cir.1987). In Colorado v. Department of Interior, 880 F.2d 481 (D.C.Cir.1989), however, we distinguished between cases in which an agency has simply failed to act before a mandatory deadline and cases in which an agency has in fact acted before a compulsory deadline, but is alleged nonetheless to have fallen short of statutory requirements. In the latter situation, when the deadline for issuing regulations has passed, "the regulations promulgated to date ... constitute the [agency's] complete response in compliance with the statutory requirements." Colorado, 880 F.2d at 485. Such regulations are therefore final rules, reviewable by the Court of Appeals. See also Hercules Inc. v. EPA, 938 F.2d 276, 282 (D.C.Cir.1991).
 
 
 40
 It therefore seems at first glance that the Sierra Club properly came to this Court to challenge the Agency's failure to promulgate revisions for non-municipal facilities by the statutory deadline. Section 7006(a) of RCRA provides that "a petition for review of action of the Administrator in promulgating any regulation ... under this chapter ... may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 6976(a)(1). Colorado and Hercules suggest that because of the deadline, the revised criteria constituted a final regulation reviewable under this section.
 
 
 41
 In Colorado and Hercules, however, this Court treated the regulations under review as final actions in light of the fact that the respondent agencies themselves considered their actions to be complete and sufficient responses to the relevant statutory requirements. We observed in Colorado that "[the Department of the Interior] asserts (as it must) that the promulgated type A regulations fully comply with CERCLA. Thus ... petitioners in this case simply seek judicial review of final agency action." Colorado, 880 F.2d at 485.
 
 
 42
 In the present case, by contrast, the Agency acknowledges that because the promulgated revisions do not address non-municipal facilities, they do not fully satisfy RCRA § 4010(c). See supra pp. 345-46. Far from claiming that its actions are complete, the Agency explicitly states its intention to issue revised criteria for non-municipal facilities when it has the data necessary to do so. In such circumstances, it would be incongruous to categorize the Agency's rule as the "final" regulation concerning the issue of non-municipal facilities. In light of the Agency's announced intent to address nonmunicipal facilities in future rulemakings, the Sierra Club's attack on the Agency's failure to promulgate revised criteria for these facilities by the deadline is most naturally seen, not as a challenge to a final rule, but rather as a claim that the Agency has failed to perform a nondiscretionary act. According to RCRA, the petitioner must challenge such a delinquency in the district court, not in the court of appeals. 42 U.S.C. § 6972(a)(2).
 
 
 43
 We have no doubt that the Agency has violated the unambiguous mandate of RCRA § 4010(c) by failing to issue revised criteria for all facilities, including non-municipal facilities, "that may receive hazardous household wastes or hazardous wastes from small quantity generators" by March 31, 1988. We hold, however, that because the Agency itself acknowledges that the rule under review does not represent the final regulation as to nonmunicipal facilities, an action to enforce the Agency's timely compliance with this section must be brought in district court. We therefore dismiss without prejudice the Sierra Club's claims regarding the Agency's failure to promulgate revised criteria for nonmunicipal Subtitle D facilities. If the Agency's dilatory behavior persists, the Sierra Club can pursue the matter in district court.
 
 MIKVA, Chief Judge, dissenting in part:
 
 44
 I write separately to dissent from my colleagues' holding in Section II of the per curiam opinion. EPA refused to promulgate any specific numeric limits at all for toxic substances contained in sewage sludge co-disposed with garbage. The majority rejects NRDC's assertion that EPA should instead have applied the same numeric limits to co-disposed sludge that it applies to monofilled sludge. Because EPA has never contended that garbage can reduce the polluting effects of sludge, I would order the agency to impose the limits developed for monofilled sludge to co-disposed sludge as well.
 
 
 45
 EPA based its decision not to issue numeric limits for co-disposed sludge on its lack of full understanding concerning the chemical interaction between sludge and the leachate from garbage in a landfill. Nowhere, however--not in the Federal Register, not in its brief, and not in oral argument--did EPA refer to any evidence in the record that garbage could decrease the leaching of toxic substances from sludge. In the preamble to the final rule, EPA discussed its uncertainty as to the effects of sludge on garbage, but it did not mention the effects of garbage on sludge. 56 Fed.Reg. 50,997 (1991). In its brief, in response to NRDC's contention that the agency had indicated no way in which garbage reduces leaching from sludge, EPA simply repeated its irrelevant statements concerning the effects of sludge on garbage. Finally, in oral argument, counsel for EPA was not able to point to any place in the record in which the agency suggested that garbage might mitigate the polluting potential of sludge:
 
 
 46
 EPA: There's no guarantee, even though NRDC paints it as such, that garbage would in fact increase the leaching of pollutants in sewage sludge, and EPA didn't say that.
 
 
 47
 Chief Judge Mikva: You know it won't decrease it, though.
 
 
 48
 EPA: It's not clear that it won't decrease it--we said our understanding was preliminary.
 
 
 49
 Chief Judge Mikva: Tell me where in the record there is any indication that it might possibly decrease it, and that was the basis for the Agency's failure to act here. Any place?
 
 
 50
 EPA: In the Joint Appendix, page 21, it says, "Understanding of this phenomenon is still preliminary, and at this juncture the Agency cannot measure the extent to which sewage sludge reduces the mobility of metals in landfills. Until it has some scientific basis for quantifying the process,--"
 
 
 51
 Chief Judge Mikva: Counsel, sewage sludge reduces the impact on the garbage, right? Is there any place where it says we don't know whether garbage will reduce the impact on the sewage sludge?
 
 
 52
 EPA: It does say--without--not explicitly.
 
 
 53
 As the regulations now stand, a polluter who needs to dispose of a volume of contaminated sludge can get out from under the numeric limitations requirement simply by mixing in a few pails of garbage, despite the fact that EPA has never suggested on the record that garbage might make sludge less of a hazard. In light of EPA's failure to articulate any uncertainty as to the effects of garbage on sludge, it was arbitrary and capricious for the agency to decline to apply the numeric limitations developed for monofilled sludge on co-disposed sludge as well. Because the validity of the removal credit scheme is inextricably linked to the legality of EPA's failure to promulgate the required numeric limits, I would also hold that removal credits are unavailable until EPA fully satisfies the requirements of Section 405 of the Clean Water Act by imposing numeric limits on co-disposed sludge.
 
 
 
 [1]
 Sludge is the solid by-product of sewage treatment plants. Such plants, also known as publicly owned treatment works, typically treat both domestic wastestreams (from individual households) and industrial wastestreams (from industrial sources). The treatment produces an effluent--treated wastewater which is usually discharged in surface water. The solids removed in the treatment process compose the sludge
 
 
 [2]
 During the pendency of this appeal, the Agency promulgated its final rule governing non-co-disposed sludge. See 58 Fed.Reg. 9248 (1993)
 
 
 [3]
 The oral argument of this case generated some confusion on this subject. At one point, agency counsel said that in the preamble to the rules the Agency found that mixing sludge with garbage increased the leaching of the sludge pollutants. The preamble, however, does not say this. It states only that the decomposition of garbage promotes "the leaching of metals and other substances from the garbage." 56 Fed.Reg. 50,997 (1991) (italics added). Perhaps realizing the mistake, agency counsel shortly thereafter denied that the Agency had found the leaching of sludge pollutants to be greater when sludge and garbage are combined. When asked if mixing sludge with garbage will decrease the leaching of pollutants from sludge, agency counsel responded by saying this was not clear because not enough was known about the chemical interaction
 
 
 [4]
 Public participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish minimum guidelines for public participation in such processes
 42 U.S.C. § 6974(b)(1). The Clean Water Act's public participation requirement is substantially similar, see 33 U.S.C. § 1251(e); to the extent it applies to these regulations, it does not mandate any substantive limitations on the Agency independent of those imposed by § 6974.
 
 
 [5]
 After the filing of timely petitions for review of these guidelines, the Agency promulgated revised guidelines as part of a settlement agreement. See 46 Fed.Reg. 47,048-49 (1981). The limitations period for further challenge to these guidelines has long since expired. See 42 U.S.C. § 6976(a)(1)
 
 
 [6]
 The Agency indicated in the preamble to its final municipal landfill rule that it would likely propose additional public participation guidelines in conjunction with its forthcoming rules for state implementation of the new regulations. See 56 Fed.Reg. 50,994-95 (1991)
 
 
 [7]
 See 56 Fed.Reg. at 50,989-91; Brief of Respondent at 38-45