**UNITED STATES of America; State of California, ex rel., Department of Fish and Game, State Lands Commission, and Department of Parks and Recreation, Plaintiffs,**

v.

**MONTROSE CHEMICAL CORPORATION OF CALIFORNIA; Rhone–Poulenc Basic Chemicals Company; Atkemix Thirty–Seven, Inc.; Stauffer Management Company; ICI American Holdings, Inc.; Chris–Craft Industries, Inc.; Westinghouse Electric Corporation; Potlatch Corporation; Simpson Paper Company; and County Sanitation District No. 2 of Los Angeles, Defendants.**

And Related Third Party Actions.

No. CV 90–3122 AAH.

United States District Court,
C.D. California.

April 6, 1995.

Gerald F. George, Helen Kang, Environmental Enforcement Section, Environment & Natural Resources Div., U.S. Dept. of Justice, San Francisco, CA, Adam M. Kushner, Robert Oakley, Sharon Zamore, Steven O'Rourke, Environmental Enforcement Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for plaintiff the U.S.

John A. Saurenman, Deputy Atty. Gen., Los Angeles, CA, Sara J. Russell, Deputy Atty. Gen., Oakland, CA, for the State of Cal.

Moses Lasky, Charles B. Cohler, David M. Rosenberg-Wohl, William A. Logan, Jr., La-sky, Haas, Cohler, & Munter, San Francisco, CA, for Westinghouse Elec. Corp.

Karl S. Lytz, Latham & Watkins, San Francisco, CA, Kimberly M. McCormick, Latham & Watkins, San Diego, CA, for Montrose Chemical Corp. of California.

Frank Rothman, Peter Simshauser, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for Chris–Craft Industries, Inc.

Paul B. Galvani, Ropes & Gray, Boston, MA, for defendants Rhone–Poulenc, Stauffer Management, Atkemix and ICI American Holdings, Inc.

## AMENDED DECISION, FINDINGS, CONCLUSIONS, AND REASONING SUPPORTING SUMMARY JUDGMENT FOR DEFENDANTS AS TO THE FIRST CAUSE OF ACTION IN THE SECOND AMENDED COMPLAINT BASED ON THE STATUTE OF LIMITATIONS (To Make Minor Changes)

HAUK, District Judge.

### INTRODUCTION

The United States and the State of California ("Plaintiffs") brought suit through a second amended complaint on August 16, 1991 for violations under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601–9675. The First Cause of Action states a claim for natural resource damages under 42 U.S.C. § 9607(a). Plaintiffs seek to recover damages for losses to natural resources in the Southern California Bight resulting from DDT discharges from the Montrose Plant and PCB discharges from the Westinghouse Plant, both located in the Los Angeles basin. The Second Cause of Action states a superfund claim for all costs incurred by the United States in connection with removal and remedial actions taken at the Montrose National Priority List site in Torrence, California. Plaintiffs sued numerous potentially responsible parties as defendants for releases of hazardous substances, including the Montrose Defendants [1] and Westinghouse Electric Corporation ("WEC").

1. The Montrose Defendants include the following: Montrose Chemical Corporation of California; Rhone–Poulenc Basic Chemicals Co., now a division of Rhone–Poulenc, Inc.; Atkemix Thirty-

On January 17, 1990, Plaintiffs served Defendants with a 60–day notice of intent to bring this action under CERCLA, as amended by the Superfund Amendments and Reauthorization Act ("SARA"). On March 6, 1990, Plaintiffs convened a meeting with potentially responsible parties to discuss a proposed law suit. On March 9, 1990, Plaintiffs and Defendants entered into an agreement tolling the statute of limitations, deeming that this action commenced for statute of limitations purposes on March 19, 1990. On June 18, 1990, Plaintiffs filed their original complaint asserting a claim for natural resource damages as the first cause of action.

On May 12, 1993 the Montrose Defendants and WEC moved for summary judgment against Plaintiffs pursuant to Rule 56 of the Federal Rules of Civil Procedure based on the statute of limitations. On May 26, 1993, this Court transferred the motions for summary judgment to Special Master Peetris for recommendation, who then conducted a hearing on September 15, 1993. On August 17, 1994, Special Master Peetris filed a report with this Court recommending that these motions be denied. Both the DDT Defendants and WEC object to the Special Master's recommendation and petition this Court for de novo review. On March 22, 1995, the Court heard full argument on this matter and granted the defendants' Motion for Summary Judgment on the First Cause of Action Based Upon the Statute of Limitations. The Court now sets forth its opinion.

## STATUTE OF LIMITATIONS

The original statute of limitations for CERCLA natural resource damage claims was three years from the date of passage of the statute, December 11, 1980, or from the date of discovery. 42 U.S.C. § 9612(d) (superseded). Since the Department of Interior ("DOI") failed to promulgate regulations required by the original CERCLA, Congress passed the Superfund Amendment and Reauthorization Act of 1986 (SARA), P.L. 99–499

(October 17, 1986), 100 Stat. 1615ff., to resurrect causes of action that would have been barred by the original statute of limitations. SARA contained a new statute of limitations that is relevant to this matter. It states in pertinent part:

> [N]o action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:
>
> (A) The date of the discovery of the loss and its connection with the release in question.
>
> (B) The date on which regulations are promulgated under section 9651(c) of this title.

42 U.S.C. § 9613(g)(1). This statute of limitations in SARA comprises two prongs, the discovery prong and the date of promulgation prong, each prong setting forth a date when the statute begins to run. The later of the two dates controls, so a claim for natural resource damages must be filed within three years of the later date. By stipulation of the parties, the natural resource damages claim in this case was deemed filed on March 19, 1990. The issues before the Court involve interpreting these two prongs of the limitations provision in SARA to determine when the statute began to run.

### A. The Date of Regulations Prong

Under this prong, the limitations period begins on the "date on which regulations are promulgated under section 9651(c) . . . ." 42 U.S.C. § 9613(g). Section 9651(c) directs the President to promulgate regulations for the assessment of damages to natural resources resulting from releases of oil or hazardous substances, and although CERCLA originally provided that these regulations shall be promulgated by December 11, 1982, given the President's failure to act, SARA extended the allotted time, stating that these regulations shall be promulgated not later than six months after October 17, 1986.[2] Section

seven, Inc.; Stauffer Management Company; ZENECA Holdings, Inc., formerly known as ICI American Holdings, Inc.; and Chris–Craft Industries, Inc.

**2.** 42 U.S.C. § 9651 provides:

(c) Regulations respecting assessment of damages to natural resources
(1) The President, acting through Federal officials designated by the National Contingency Plan published under section 9605 of this

9651(c) requires the promulgation of two types of regulations, Type A and Type B. Type A would set forth standard procedures for simplified assessments requiring minimal field observations, and Type B procedures would set forth alternative protocols for conducting assessments in individual cases to determine the type and extent of short and long-term injury, destruction, or loss. 42 U.S.C. § 9651(c)(2); *see generally State of Ohio v. U.S. Dept. of the Interior,* 880 F.2d 432 (D.C.Cir.1989); *State of Colorado v. U.S. Dept. of the Interior,* 880 F.2d 481, 487 (D.C.Cir.1989). Type B procedures were finally promulgated by DOI on August 1, 1986. 43 C.F.R. §§ 11.60–11.84. Type A procedures for coastal and marine environments were later promulgated on March 20, 1987. 43 C.F.R. §§ 11.40–11.41. The issue before the Court, a purely legal one, is whether Congress intended the statute to begin to run under the regulation prong when Type B regulations were promulgated or when both Type B and Type A regulations are promulgated.

**Discussion**

 CERCLA is anything but a model of lucid legislation, and in the absence of instructive case law, the Court must construct and extract meaning from this cryptic statute by giving primary consideration to Congressional intent. In this case, the Court finds adequate evidence that Congress intended the limitations period to begin running on August 1, 1986, when Type B regulations were promulgated.

First, as an explanation of § 9651, the October 3, 1986 Joint Explanatory Statement of the Committee of Conference report, which was made the same day SARA was passed, states:

> title, shall study and, not later than two years after December 11, 1980, shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this chapter and section 1321(f)(4) and (5) of Title 33. Notwithstanding the failure of the President to promulgate the regulations required under this subsection on the required date, the President shall promulgate such regulations not later than 6 months after October 17, 1986.

The conference substitute adopts the Senate provision that directed the President to promulgate the regulations for assessing damages to natural resources under section 301 [9651] of CERCLA not later than six months after enactment.... The deadline established by these amendments differs from that currently imposed by the court in *New Jersey v. Ruckelshaus,* Civil Action No. 84–1668(JWB) (D.C.N.J.1983), solely for the purpose of allowing additional time, if necessary, for re-proposal of regulations required by section 301(c) [9651(c)] should those initially submitted to the court be inadequate. *While acknowledging the failure of the President to promulgate those regulations, this amendment does not sanction that failure or any further delay unless it is essential to assure the adequacy of the regulations.... Regulations were proposed under this section in December, 1985, [the Type B regulations] and it may be necessary to repropose [sic] these regulations to come into conformity with the provisions of section 301(c) [9651(c)] and the amendments to section 107(f) [9607(f)].*

H.R.Conf.Rep. No. 99–962, 99th Cong., 2d sess. 183, 205 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 3276, 3298 (emphasis added).

This provision indicates that when Congress referred to "regulations" under § 9651(c), it meant only the Type B regulations. Thus, Congress intended "promulgation of regulations" as used in § 9613(g) to mean the promulgation of Type B regulations, not Type B plus all of the Type A regulations. Type A procedures for marine and coastal environments were proposed on May 5, 1986, and Congress could have also

> (2) Such regulations shall specify (A) standard procedures for simplified assessments requiring minimal field observation, including establishing measures of damages based on units of discharge or release or units of affected area, and (B) alternative protocols for conducting assessments in individual cases to determine the type and extent of short- and long-term injury, destruction, or loss.
>
> 42 U.S.C. § 9651 (1994).

referred to those regulations in this report if it so intended. Apparently, Congress was not interested in the Type A regulations, and consequently, this Court finds that Congress did not intend for the entire statutory scheme under § 9651(c) to be promulgated before the limitations period would begin to run.[3] This interpretation makes sense in light of the relative importance of the Type B regulations, which provide detailed procedures for damage assessment in any environmental context. 43 C.F.R. §§ 11.60–11.84.

Second, Type A procedures are being promulgated by DOI in piecemeal fashion, and they are not all yet fully promulgated. Although the Type A procedures for coastal and marine environments were finally promulgated on March 20, 1987, additional Type A regulations are still being proposed for different types of ecosystems. 51 Fed.Reg. at 16636. For example, Type A procedures for desert areas, mountains or rivers and streams are not yet promulgated. Nevertheless, Type B procedures promulgated on August 1, 1986 can be used for damage assessment in each of these environments. Thus, if the limitations period would not begin until all the Type A regulations are promulgated, then the limitations period has not yet begun to run as of this date, almost ten years after SARA was passed. Congress certainly did not intend to toll the limitations period for natural resource damages under this prong until some undetermined date like this in the future.

Holding that the limitations period would not begin to run until the Type A regulations are promulgated would mean either that the period has not yet as of this date begun or that the limitations period for the same cause of action would depend on the particular type of environment at issue. Both results are absurd.

Third, Congress intended that CERCLA natural resource damage claims ought to be brought as early as possible. Legislative history indicates:

The Committee believes that cost recovery and damages actions should be brought at the most appropriate time in light of the response action taken, and that in general these actions should be brought as early as EPA has the necessary information to do so.

H.R.Rep. No. 99–253(III), 99th Cong., 2nd Sess., at 20 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3043. The Court interprets "date on which regulations are promulgated" in § 9613(g) to mean the date the applicable regulations are promulgated. Congressional intent requires this interpretation because the EPA would presumably have the necessary information to bring an action on the date the applicable regulations are promulgated.

Type A regulations are not relevant or pertinent in any way to this case. The lead trustee agency for the Montrose site, the National Oceanic Atmospheric Administration ("NOAA"), knew as early as 1985 that only Type B regulations could be used in this case. Congress intended for Type B regulations and damage assessment procedures to cover large or unusually damaging releases and to cover all types of natural resource injuries; whereas Type A regulations are to be used for minor, short duration releases of hazardous materials in coastal or marine environments. *State of Colorado v. U.S. Dept. of the Interior,* 880 F.2d 481, 487 (D.C.Cir. 1989) (citing S.Rep. No. 848, 96th Cong., 2d Sess. 86 (1980), *reprinted in* 1 Congressional Res. Serv., Library of Cong., *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980*). The Type B rules would be employed in large or unusually damaging releases and would be used to guide the site-specific damage assessment. *Id.* On June 30, 1985, the NOAA issued a Site Review of the Montrose Plant which described the scope and complexity of the natural resource damages action Plaintiffs contemplated and confirmed that a simplified Type A assessment would not be of use in this case.

**3.** This report also indicates that Congress operated under the mistaken assumption that as of October 3, 1986 Type B regulations were only proposed and not yet promulgated. For this reason, Congress did not explicitly set August 1, 1986, as the date the limitations period would begin.

Thus, on August 1, 1986, the date Type B regulations were promulgated, the EPA and the trustees possessed all the legal tools necessary to bring an action for natural resource damages under CERCLA against the Montrose defendants and WEC. Since Congress intended that CERCLA actions be brought as early as possible, the Court would be remiss not to interpret August 1, 1986 as the date the limitations period began to run under the promulgation of regulations prong of § 9613(g). Holding that the limitations period began on March 20, 1987 would grant Plaintiffs an enlarged grace period based on a technical reading of the statute since Type A regulations are irrelevant in this case. Thus, since this claim was deemed filed on March 19, 1990, more than three years after August 1, 1986, Plaintiffs failed to meet the limitations period under this prong.

### Plaintiffs' Position

Plaintiffs contend that based on the statutory language, the statutory scheme and indicia of congressional intent, Congress intended that both the Type A and Type B regulations be promulgated before the limitations period begins. They first note the rule set by the Supreme Court that a statute of limitations sought to be applied to bar rights of the Government must receive a strict construction in favor of the Government. *Badaracco v. Commissioner of Internal Revenue*, 464 U.S. 386, 398, 104 S.Ct. 756, 764, 78 L.Ed.2d 549 (1984); *E.I. duPont de Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924). Moreover, regarding CERCLA, courts have held that CERCLA must be broadly and liberally construed to give effect to the goals and intentions of Congress that those responsible for the problems caused by the disposal of hazardous substances bear the costs and responsibility for remedying the harm they created. *Kelley v. E.I. duPont de Nemours & Co.*, 786 F.Supp. 1268 (E.D.Mich.1992); *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H. 1985).

Plaintiffs rely on an unpublished opinion that addressed this particular issue. *United States v. Seattle*, 33 E.R.C. 1549, 1991 WL 208805 (W.D.Wash. Jan. 23, 1991). The court in *Seattle* held that Congress intended

for the trustees to consider both Type A and Type B procedures before conducting damage assessments. The court relied on legislative history that states:

The [House Committee on Merchant Marine and Fisheries] further intends that the natural resource trustees exercise appropriate discretion in deciding whether, to undertake a major, Type "B" natural resource damage assessment. The Committee does not intend by this amendment to provide federal or state natural resource trustees with blank checks to conduct resource assessments. A decision on whether to undertake an assessment must take into account, among other things, the costs of the assessment in relation to the value of the damages that may have occurred and the likelihood that the assessment will lead to a successful action to recover the damages.

H.R.Rep. No. 253(IV), 99th Cong., 2nd Sess. at 53, *reprinted in* 1986 U.S.C.C.A.N. 3068, 3083. The *Seattle* court interpreted this provision to mean that Congress envisioned that trustees would use their discretion in choosing between Type A and Type B procedures, so the "regulations" stated in SARA § 9613(g) referred to both Type A and Type B regulations. Moreover, since SARA was passed after Type B regulations were promulgated, Congress could have indicated that the limitations period would begin on the date Type B regulations were promulgated. By leaving the date open, Congress intended that all of the regulations, Type B and Type A, be promulgated before the limitations period would begin.

In addition, the Plaintiffs argue that § 9613(g) states that the controlling date is the one on "which regulations are promulgated under section 9651(c) of this title." Section 9651(c) calls on the President to enact two types of regulations, Type A and Type B. Congress presumably knew that § 9651(c) required two types of regulations when it enacted § 9613(g). The plain meaning of "regulations" under a particular section would encompass all the regulations under that section, especially when the section specifically calls for two distinct types of regulations. *See Church of Scientology of Califor-*

*nia v. U.S. Dept. of Justice,* 612 F.2d 417, 421 (9th Cir.1979) ("if the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the language by resorting to the legislative history or other extrinsic aids"). Plaintiffs argue that it would be a logical stretch to interpret the phrase "regulations" under a particular section to mean only one-half of the regulations under that section, especially when nothing in the wording of either § 9613(g)(1)(B) or § 9651(c) suggests that Congress intended anything other than that the limitations period would be triggered only when trustees had the complete set of § 9651(c) regulations. Congress could easily have specifically provided that the limitations period would begin after Type B regulations were promulgated if it intended that result, but instead chose to use the more general phrase "regulations under section 9651(c)."

Plaintiffs further argue that holding that the limitations period began when Type B procedures were promulgated assumes that the date the limitations period begins to run depends on the type of regulation used. The regulations under § 9651(c) provide procedures for assessing damages, not causes of action. This interpretation would produce the anomalous result of Congress establishing different limitation periods for natural resource damages depending solely on whether the trustees choose to conduct a Type A or Type B assessment. Also, this interpretation would not allow the trustees the benefit of having the complete set of regulations, both Type A and Type B, before they begin assessing the natural damages. If the limitations period began to run when Type B regulations were promulgated, the trustees would have to plunge forward with the more complex Type B assessments possibly before the Type A regulations would be available.

Moreover, Plaintiffs maintain that this position is untenable when taken to the extreme. If DOI promulgated Type A regulations four years after its Type B regulations, Plaintiffs would need to bring suit before they could even determine if Type A regulations were applicable, because the three-year limitation period would have ended. If the trustees waited until Type A regulations were promulgated to determine if they were more relevant to the problem at hand, they would be barred from using the Type B assessment procedures because the three-year limitations period would have ended. Accordingly, if the statute on natural resource damages actions began to run when Type B regulations were promulgated, then Type A regulations would be useless because the three-year limitations period would end before Type A regulations could be available.

### Response to Plaintiffs' Position

The Court notes the various arguments to which the cryptic CERCLA lends itself, but respectfully disagrees. First, the Court rejects the argument that § 9613(g) is clear on its face. The phrase "promulgation of regulations" could mean Type B regulations for reasons stated above, and the evidence heretofore points in that direction. Second, since Type A regulations are irrelevant to this case and since NOAA knew this fact in 1985, there was no need for Plaintiffs to wait until the Type A regulations were promulgated to exercise some abstract notion of discretion, because they already knew they could not use the Type A procedures. For similar reasons, this Court finds the *Seattle* decision inapplicable to and distinguishable from this case. Type A regulations were relevant to that case. This case is different because Type A regulations are inapplicable and irrelevant here. Finally, the Court finds unpersuasive the hyperbolic concerns of Plaintiffs regarding taking the Court's interpretation to the extreme, which in any case is overshadowed by the vagaries involved in interpreting the statute to mean that the limitations period begins to run only after promulgation of all the Type A regulations plus the Type B.

### B. Discovery Prong.

■ The discovery prong of the statute of limitations states that actions for natural resource damages must be brought within three years of the "date of the discovery of the loss and its connection with the release in question." 42 U.S.C. § 9613(g). Since this case was deemed filed on March 19, 1990, if the "date of discovery" was before March 19,

1987, then Plaintiffs failed to meet the limitations period under this prong.

Defendants in this case bear two burdens: First, they bear the initial burden of showing that there is no genuine issue as to any material fact; second, they bear the burden of demonstrating that prior to March 19, 1987, Plaintiffs had knowledge of the releases, of the loss of resources alleged and the connection between the releases and the loss.[4]

Plaintiffs allege that the DDT releases from the Montrose Plant and White's Point Outfall have injured the surface water and sediments, flora and benthic infauna, shellfish, finfish, birds and mammals. The Court finds that both the Montrose Defendants in its Statement of Uncontroverted Facts and Conclusions of Law filed herein on June 7, 1993 and WEC in its Statement of Uncontroverted Facts and Conclusions of Law filed herein the same day have carried their burden that the Plaintiffs had actual knowledge of the releases and their connection with the loss before March 19, 1987. Accordingly, the Court finds that there is no genuine issue of material fact and that NOAA, Fish and Game, State Lands Commission, Parks and Recreation and all the trustees knew of the DDT and PCB releases from the Montrose Plant and WEC and their connection to the injury to natural resources. Therefore, Plaintiffs also failed to meet the statute of limitations under this prong.

The Court finds it necessary only to set forth the most convincing evidence out of the plethora of documents submitted in support of this motion.

Most telling is that on June 30, 1985, NOAA, the lead trustee, issued a Coastal Hazardous Waste Site Review of the Montrose Plant. The 1985 Site Review states:

> The [Montrose Plant] facility operated at this site from 1948 until 1982. Process water was discharged into the sewer system from about 1953 until 1970. Surface runoff from the site continued until about March 1985, when Montrose capped the contaminated soil with asphalt. There have also been reports of airborne contamination resulting from grinding operations carried out as part of DDT processing on the site.

(McCormick Declaration Exhibit 17 at 338). The review also describes the physical extent of contamination from DDT releases from the Montrose plant:

> An estimated 340 tons of DDT is still contained in the top one and one half meters of soil on the manufacturing site. The mass of DDT contained in sediments in Joint Outfall 'D' is estimated to be 44 tons. The top one-third meter of sediments in a 29–square kilometer area surrounding the ocean outfall contains an estimated 200–275 tons of DDT. Finally, the sediments of Los Angeles and Long Beach Harbors are likely to have been contaminated by surface runoff via Dominguez Channel and airborne emissions.

*Id.* The review explicitly states that the "most significant contribution of DDT to the environment is documented to have originated from Montrose Chemical Corporation" and describes the natural resources at risk and the loss to the environment from the DDT.

For example, the review explains: Over 120 species of fish exist in the coastal waters adjacent to the Montrose site, and resident populations in the vicinity are likely to suffer detrimental impact from exposure to DDT. Benthic invertebrates, including mollusks, annelids, coelenterates, and crustaceans, are in direct and constant exposure to contaminated sediments, and these organisms probably represent the current point of DDT entry into the food chain. Several fish species including white croaker, black perch, white perch, halibut, queenfish and rockfish have exhibited demersal feeding habits. Resident bird populations in the coastal area of the site were reduced by the documented DDT discharges, particularly the pelican and cor-

---

4. The parties address the issue of whether this provision requires Plaintiffs to have actual knowledge of the loss and its connection with the release in question or does the discovery prong contain an implicit "should have known" standard. Plaintiffs argue that § 9613(g) does not incorporate a "should have known" standard, but requires actual knowledge. Because the Court finds that Plaintiffs had actual knowledge, it need not address this question.

morant. Several species of Pandilid shrimp are potentially endangered. The long-term persistence of DDT is a serious threat to the local marine fauna in the vicinity of the site. In 1985, white croaker were found to contain 2.6 to 7.6 ppm DDT. From 1981 to 1985, DDT concentrations in fat ranged from 126 to 2,070 milligrams per kilogram (mg/kg) of wet fat tissue; this is a clear indication of bioaccumulation. The report warned that the process of bioaccumulation represents a threat to human health. DDT was also found in the blubber of the Baltic grey seal, the ringed seal and the common grey seal. *Id.* at 338–40.

The description of DDT releases made from the Montrose Plant and the consequential injury to the environment described in this Site Review remarkably resembles and is even identical to many of the allegations Plaintiffs make in the second amended complaint. Apparently, Plaintiffs relied directly on information known in 1985 when it made those allegations.

Additionally, the Montrose Defendants proffer numerous documents confirming that both the federal and state plaintiffs knew of the alleged losses and their connection with the releases before March 19, 1987. The deposition of Lawrence R. Espinosa indicates that prior to the mid–1980s, California Department of Fish and Game knew that sediments around the White's Point Outfall contained high levels of DDT, that benthic infauna including phytoplankton and zooplankton had a high body burden of DDT caused by discharges from the White's Point Outfall. (McCormick Declaration Exhibit 10). They were also aware of losses of pelicans, falcons, eagles, cormorants and gulls that were attributed to eggshell thinning allegedly caused by DDT from the White's Point Outfall and the Montrose Plant. *Id.*

NOAA scientist Robert DeLong published a paper describing an association between DDT levels in California sea lions and premature sea lion births. (McCormick Declaration Exhibit 13). Fish and Game was aware of the impact of DDT on marine mammals in Southern California, including bottle nose dolphins and the California sea lion. (McCormick Declaration Exhibit 58). They

also became aware of DDT discharges from the Montrose Plant to the Sanitation District's sewer system and resultant discharges from the Sanitation District through the White's Point Outfall. (McCormick Declaration Exhibit 14). Both Fish and Game and Parks and Recreation regularly received the Southern California Coastal Water Research Project ("SCCWRP") reports that contained extensive information about alleged DDT discharges into the Southern California Bight from the White's Point Outfall and Montrose Plant. The 1973 Annual Report stated:

> The Montrose Chemical Company is the world's major producer of DDT. Prior to 1970, the company discharged processed wastes into the wastewater collection system of the County Sanitation Districts of Los Angeles County.... The major discharge of DDT through the White's Point Outfall system undoubtedly caused the abnormally high concentrations observed in both the intertidal organisms, fish and sediments of the area.

(McCormick Declaration Exhibit 19). According to the deposition of Francis Cornelius Buchter, California Parks and Recreation was aware of the effects of DDT on animals, plants and sediments, including bird reproduction and marine life before 1980. (McCormick Declaration Exhibit at 11).

Regarding WEC, evidence indicates that Plaintiffs knew that the California Sea Lion suffered injury associated with PCBs long before March 19, 1987. The primary evidence associating premature birth in the California Sea Lion with DDTs and PCBs is that high concentrations of these compounds have been measured in the tissues of premature parturient females and pups, and this evidence was gathered in the 1970's by Robert DeLong. As early as 1973, DeLong reported on the presence of high PCB concentrations in the tissue of California Sea Lions collected from the Southern California Bight and their possible association with premature births. This knowledge was confirmed by George Kinter in a deposition admitting that NOAA knew of a possible connection between PCBs and impaired reproduction in marine mammals at the time of the DeLong report's publication in 1973. (Silverman Declaration

Exhibit G at ¶¶ 6, 7). Further DOI testified that its National Park Service regularly received reports by DeLong on the sampling of California Sea Lion tissue for DDT and PCB residues, near the time of their publication in the 1970's. (Silverman Declaration Exhibit L at ¶¶ 9, 10). This would include not only the DeLong report of 1973 discussed above, but also a report published in 1976 by DeLong, which in Plaintiffs' own words "verified with a larger sample" the "association between the premature animals [California Sea Lions] and higher concentrations of DDTs and PCBs." (Silverman Declaration Exhibit P at ¶ 11).

Further, the possible connection between impaired reproduction in the California Sea Lion and the releases of PCBs from the Joint Water Pollution Control Plant ("JWPCP") was also known by plaintiffs before March 19, 1987. As PCBs do not occur naturally, a reasonable person or entity with knowledge of their presence in an natural resource would link those PCBs to an artificial source. By January 1986, NOAA had reported and generated information itself purporting to show the presence of PCBs in sediment around the White's Point Outfall and in fish collected from Palos Verdes waters. (Silverman Declaration Exhibits Q, R & S). These reports show that by March of 1986, NOAA had purportedly linked the presence of PCBs in Palos Verdes fish and shellfish to the discharge of PCBs from the JWPCP. Similarly, Fish and Game admitted by deposition of Lawrence R. Espinosa that it was aware of a connection between injuries to the California Sea Lion and PCB releases from the JWPCP in 1985–86. (Logan Declaration Exhibits A & B).

Additionally, the statute of limitations also bars Plaintiffs' claim for loss of fisheries. Plaintiffs assert in their Draft Injury Determination Plan of March 8, 1991, that the interim guidelines issued in April of 1985 by the California Department of Health Services ("DHS") advising against the consumption of Santa Monica Bay and Palos Verdes Peninsula sport fish because of DDT and PCB contamination "meets this definition of injury." These interim guidelines speak of PCB contamination and advise specifically to "[a]void eating any fish caught in areas immediately around White's Point Outfall." (Silverman Declaration Exhibit J at 2). NOAA was well aware of these interim guidelines as early as 1985–86. NOAA's designated witness on deposition, George L. Kinter, admitted not only receiving the interim guidelines between 1985 and 1986, but also discussed their "import" during that time period with Mark Eames, NOAA legal counsel. (Silverman Declaration Exhibit H). Kinter also discussed the interim guidelines with Robert Pavia, an employee of NOAA's Hazardous Materials Response Branch before the end of 1986. (Silverman Declaration Exhibit H).

Further, Lawrence R. Espinosa admitted that before 1986 Fish and Game was aware of a connection between injury to shellfish and finfish and PCB releases from the JWPCP. (Logan Declaration Exhibits A & B).

The evidence noted above satisfies the Court that there was widespread knowledge among important members of the trustee agencies regarding the alleged losses and their connection with the releases. CERCLA is silent on the issue of who within the government agencies must discover the loss and its connection to defendants' releases for the statute to run under § 9613(g)(1). However, the Second Circuit found that widespread knowledge among lower echelons can be attributed to the agency when a government employee with knowledge has a duty to transmit that knowledge. *In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2nd Cir.1987), *cert. denied sub nom Pinkney v. Dow Chemical Co.*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). This Court finds that, in this case, sufficient employees within the governmental agencies with a duty to transmit the necessary information possessed the relevant knowledge prior to March 19, 1987.

**Plaintiffs' Position**

■ Plaintiffs assert that CERCLA requires the President and state governors to appoint officials to act on behalf of the public as trustees for natural resources to assess damages. 42 U.S.C. § 9607(f)(2). "When a

statute is silent ... [on] a particular issue, [the court] must defer to the reasonable interpretation of the agency responsible for administering the statute. By leaving a gap in the statute, Congress implicitly has delegated policy-making authority to the agency." *State of Washington, Department of Ecology v. U.S. E.P.A.,* 752 F.2d 1465, 1469 (9th Cir.1985) (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)); *see also Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) ("courts generally will defer to an agency's construction of the statute it is charged with implementing....."). Plaintiffs argue that Congress entrusted DOI with the promulgation of the regulations for implementation of natural resource damage assessments. DOI has interpreted this CERCLA provision to mean that the authorized official within the trustee agency must acquire the knowledge of the damage and its connection to the release under § 9613(g)(1). 43 C.F.R. §§ 11.14(d), 11.23, 11.61.[5] Plaintiffs argue that the DOI's interpretation is sound because it ensures that a potentially expensive damage assessment and a concomitant natural resource damages action do not proceed to the detriment of the public without a probability of success determination by the authorized official.[6]

The DOI regulations provide guidance for the gathering of the appropriate quantum and quality of information. For this purpose, the DOI regulations provide that before any assessment can proceed, a "preassessment screen" must be carried out to ensure that before monies and resources are expended there is a reasonable probability of a successful claim. 43 C.F.R. § 11.23. The authorized official determines, that (1) a release of a hazardous substance has occurred; (2) natural resources which are trust resources "have been or are likely to have been

adversely affected" by the release; and (3) the "quantity and concentration" of the substance is "sufficient to potentially cause injury" to the natural resources. *Id.* Plaintiffs assert that the date for discovery under 9613(g)(1)(A) is the date of the signing of the Preassessment Screen Determination by the authorized official for the NOAA, the trustee agency, which in this case was July 6, 1989.

### Response to Plaintiffs' Position

The Court rejects Plaintiffs' interpretation of the discovery prong under § 9613(g)(1)(A). *First,* this section nowhere mentions that the date of discovery depends on the signing of any Preassessment Screen Determination. Congress clearly intended to tie one of the statute of limitations prongs to the discovery of the harm, which does not depend on the formal signing or acknowledgment of any particular type of determination. *Second,* under Plaintiffs' reasoning the "date of discovery" could be suspended indefinitely until the authorized official ultimately decides to sign the Preassessment Screen Determination, despite the fact that the agency may have had full knowledge of the harm and its connection with the releases many years prior to that date. For example, the authorized official may theoretically sit on the information for ten or twenty years before proceeding with the Preassessment Screen Determination. This effect would contradict Congressional intent and the very purpose of a limitations period, which is to bring an end to litigation, prevent the vagaries of stale evidence and provide finality. *Third,* the proffered evidence overwhelmingly indicates that no genuine issue of material fact exists regarding Plaintiffs' knowledge of the releases and their connection with the loss.

### CONCLUSION

For the foregoing reasons, the Court grants the Montrose Defendants' and WEC's Motions for Summary Judgment as to the

---

5. Mr. Charles B. Erler of the NOAA signed the Preassessment Screen Determination.

6. The DOI regulations, in a five-step damage assessment process, provides guidance on when a claim should be brought and how to assess a claim. The first step is the preassessment screen where the trustee, through an authorized official,

initially determines whether there is a reasonable probability that a hazardous substance release may have affected natural resources and whether the potential injury is significant enough to warrant continuing with the damage assessment. 43 C.F.R. §§ 11.23—11.25.